UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**ERNEST AKERS,**<br><br>Defendant. | No. 11-cr-313-CKK-ZMF |

### REPORT AND RECOMMENDATION

Mr. Ernest Akers admitted to violating the terms of his supervised release. The parties have since provided their sentencing recommendations. *See* Def.'s Position on Supervised Release Violation ("Def.'s Memo"), ECF No. 39; *see also* U.S. Probation Office Sentencing Recommendation ("USPO Sent'g Rec."), ECF No. 38. For the reasons set forth herein, the undersigned recommends revoking Mr. Akers' from supervised release and sentencing him to one day with no additional supervision.

**I.    BACKGROUND**

On June 18, 2012, Judge Kollar-Kotelly sentenced Mr. Akers to one hundred fifty-six months of imprisonment and forty-eight months of supervised release. *See* Min. Order (June 18, 2012). On March 11, 2022, Mr. Akers began his term of supervised; it was set to expire on March 11, 2026. *See* Probation Office Petition ("Petition") 1, ECF No. 33.

On April 12, 2024, law enforcement in Maryland observed Mr. Akers asleep in a parked vehicle. *See* Petition at 2, 4. The officer also "observed a bulge from Mr. Akers' right jean pocket," which turned out to be "a silver and black handgun." *See* Petition at 4. Law enforcement

1

then arrested and detained Mr. Akens. On April 13, 2024, Mr. Akers was released on personal recognizance. *See* Petition at 4.

On June 4, 2024, the Probation Office alleged that Mr. Akers' arrest violated the conditions of his supervised release. *See* Petition at 5. On June 7, 2024, Judge Kollar-Kotelly issued a summons and referred the matter to the undersigned for a Hearing on Violation. *See* Order, ECF No. 34.

On July 2, 2024, the undersigned held a Hearing on Violation of Supervised Release. Neither the government nor the Probation Office sought detention. *See* Min. Order (July 2, 2024). Mr. Akers had stable housing and employment. Specifically, Mr. Akers worked at Sodibar Systems, a company that distributes refrigeration and beverage equipment. The manager at Sodibar Systems travelled from Maryland to attend the hearing. He testified about Mr. Akers' work ethic and why he continued to believe in Mr. Akers' potential. He further testified that Mr. Akers would continue to have employment with him and that he believed Mr. Akers was back on the right path after the Maryland arrest.[1] The parties agreed to have the instant matter trail the underlying criminal case.

On October 22, 2024, the undersigned held a status hearing. *See* Min. Order (Oct. 22, 2024). Mr. Akers' attorney informed the Court that Mr. Akers pleaded guilty to a misdemeanor charge and received a sentence that included two years of probation and one hundred fifty hours of community service. The Probation Office reported Mr. Akers' drug tests were negative for the presence of narcotics. Mr. Akers continued to have stable housing and employment at Sodibar Systems. Mr. Akers reported that he planned to take on additional employment with FACETS, a

---

[1] The Court commends this witness for his compassion. His commitment to helping returning citizens succeed—continuing to employ Mr. Akers, coming to D.C. to testify on his behalf, and taking an active role in Mr. Akers' life—is extraordinary. Support like this is essential to anyone's success, but especially a returning citizen who faces barriers to reentry.

Fairfax County nonprofit organization that provides seasonal shelter for homeless people. That role was scheduled to begin in November and end in March. Mr. Akers was looking forward to giving back to the community through this program. *See* Def.'s Opp. to USPO Sent'g Rec. ("Def.'s Opp.") 3, ECF No. 39 (October 21, 2024 offer letter of seasonal employment to Mr. Akers). Mr. Akers justifiably expressed pride in continuing to be substance-free.

Mr. Akers has met *every* benchmark set by the undersigned since the initial Hearing on Violation. Mr. Akers has consistently tested negative on all drug screenings and maintained stable housing. He has received glowing reviews from his employer at Sodibar Systems. *See* Def.'s Opp. at 1. He has timely appeared for each hearing. And he has shown respect towards Court staff, the AUSA, and his Probation Officer. Mr. Akers has gone above-and-beyond all expectations, including by seeking seasonal employment geared towards giving back to the community. *See* Def.'s Opp. at 1, 3.

Mr. Akers has admitted the pending violation. On November 14, 2024, the Probation Office recommended sentencing Mr. Akers to six months of imprisonment followed by thirty-six months of supervised release. *See* U.S. Probation Office Sentencing Recommendation ("Sent'g Rec.") 1, ECF No. 38. The Probation Office cited Mr. Akers' "substantial risk of continuing to reoffend" given his criminal history, including his "history of committing new law violations while on supervised release as well as him flagrantly defying the court's order by continuing to illegally possess firearms." Sent'g Rec. at 2–3. Mr. Akers requested a sentence of time served.

**II.      DISCUSSION**

Supervised release is governed by 18 U.S.C. § 3583.

A.  Mandatory Incarceration for Firearms Offenses

For violations relating to firearm possession, § 3583(g) requires imposition of "a term of imprisonment." So, some period of incarceration is mandatory here. However, § 3583(g) imposes no mandatory minimum for such term. *See* 18 U.S.C. § 3583(g) (stating only that "a term of imprisonment" must not "exceed the maximum term of imprisonment authorized under subsection (e)(3)"). Thus, even a brief period of incarceration, such as an hour, satisfies the statutory requirement. Here, Mr. Akers detention on April 12, 2024, satisfies the § 3583(g) requirement.

B.  Application of § 3553 Sentencing Factors

For all offenses, § 3583 directs court to § 3553(a) when imposing or modifying terms of supervision. Among the § 3553(a) factors the court should *not* consider in revocation determinations is "the need . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *See* 18 U.S.C. §§ 3583(e), 3553(a)(2)(A). "The legislative history indicates that section 3553(a)(2)(A) was not included for consideration under 18 U.S.C. § 3583(c) because the primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than punish them." U.S. Sent'g Comm'n, *Federal Offenders Sentenced to Supervised Release* (2010) ("Supervised Release Report") 9. That is, "Congress intended supervised release to be curative, not punitive." *United States v. Trotter*, 321 F. Supp. 3d 337, 351 (E.D.N.Y. 2018) (citing Michael P. Kenstowicz, *The Imposition of Discretionary Supervised Release Conditions: Nudging Judges to Follow the Law*, 82 U. Chi. L. Rev. 1411, 1411-12 (2015). The Supreme Court recently emphasized this, noting the need to "exclude retribution from the calculus . . . [and] consider the *forward-looking* ends of sentencing." *Esteras v. United States*, 145 S. Ct. 2031, 2041 (2025).

4

The first § 3553 factor, Mr. Akers' criminal history and characteristics—favors Mr. Akers. Mr. Akers' criminal history is lengthy. *See* Petition at 2. However, this was his first—and only—violation while on supervised release since March 11, 2022. Mr. Akers' Probation Officer has reported only positive progress. Mr. Akers has demonstrated care for his family and community, as evidenced by his continued employment at Sodibar Systems and work with homeless people. Mr. Aker's more recent history is the better reflection of who he is, not his crimes of the past.

Factors two, three, and four—deterrence of criminal conduct, protection of the public from further crimes of the defendant, and the need to provide the defendant with educational or vocational training, medical care or other correctional treatment—favor Mr. Akers. To the extent punishment advances deterrence or public safety goals, that box has been checked. Mr. Akers pleaded guilty to a misdemeanor violation for which he will serve two years of probation and 156 hours of community service. There is no indication of how additional incarceration furthers deterrence and public safety. *See United States v. Nwenze*, No. 19-cr-285, 2024 WL 4608867, at *4 (D.D.C. 2024).

Moreover, there is no credible argument how additional incarceration furthers Mr. Akers' rehabilitation or treatment. Mr. Akers is gainfully employed, in a stable residence, and in a treatment program. *See* Petition at 4. "[A]ny imprisonment . . . could significantly interrupt or undo his [] progress." *United States v. Mosley*, 312 F. Supp. 3d 1289, 1294 (M.D. Ala. 2018). Sending him to prison makes him 10 times more likely to be homeless or in a precarious housing situation close to homelessness. *See* Lucius Couloute, *Nowhere to go: Homelessness among formerly incarcerated people*, PRISON POLICY INITIATIVE, Aug. 2018, at https://perma.cc/7U4N-2NV2. It also puts his employment at risk. It is hard to find and keep employment after getting

out of prison. *See* Lucius Couloute & Daniel Kopf, *Out of Prison & Out of Work: Unemployment among formerly incarcerated people*, PRISON POLICY INITIATIVE, July 2018, at https://perma.cc/78J2-ZKJ4. It is nothing short of a miracle that Mr. Akers has avoided these outcomes and successfully reintegrated.

Re-incarcerating Mr. Akers would invariably result in him spending time at the D.C. jail. This gives the Court grave concern given the conditions at the D.C. jail. *See* Report by the Office of the District of Columbia Auditor and Council for Court Excellence (May 28, 2025) ("This audit offers the most comprehensive review to date of facility operations, documenting a crisis marked by rising deaths, structural decay, staff shortages, and inadequate medical and behavioral health care.") (report available at https://perma.cc/4SPB-XD9U); Washington Post Editorial Board, *D.C.'s jail is a disgrace. Still*, THE WASHINGTON POST (June 4, 2025), https://perma.cc/LZ46-AUNQ ("The rate of death at the D.C. jail is three times the average of U.S. jails. For overdose deaths, the rate is 10 times the national average. The facility — especially its main building that opened in 1976 — is ridden with cockroaches, mice and mold. In the span of just a year, an audit recorded almost 1,600 maintenance reports posing immediate health or safety risks. Most have to do with plumbing issues, which at times have resulted in "toilet water commingled with feces spewing onto residents and their living areas. Inmates are often subjected to extreme heat or cold due to poor climate-control systems."). These problems are not limited to the D.C. jail. *See United States v. Abass*, 779 F. Supp. 3d 1, 10 (D.D.C. 2025) (cataloguing problems plaguing jails). And the unduly harsh conditions at a detention facility are an appropriate consideration for courts when considering detention. *See Id.* (citing Benjamin Weiser, *Judge Refuses to Send Defendant in Drug Case to Troubled Brooklyn Jail*, NEW YORK TIMES (Jan. 4, 2024), https://perma.cc/Y2X6-V97J). The Court will not send Mr. Akers into

these deadly conditions on an underlying misdemeanor violation; especially doing so will likely completely derail his reentry and thrust him back into a life of crime. *See e.g.*, Anna Piil Damm & Cédric Gorinas, *Prison as a Criminal School: Peer Effects and Criminal Learning behind Bars*, 63 THE JOURNAL OF LAW AND ECONOMICS 1 (2020).

Factor five, the applicable "guideline" range, cuts against Mr. Akers. Chapter 7 of the Sentencing Guidelines sets forth advisory policy statements which the court may consider when imposing sanctions following a supervised release violation. *See* U.S.S.G. ch. 7, pt. A § 3(a). "Chapter 7 policy statements are not '[sentencing] guidelines.'" *United States v. Blackston*, 940 F.2d 877, 893 (3d Cir. 1991). The Sentencing Commission chose to promulgate policy statements in lieu of guidelines to "provide[] greater flexibility" and "better opportunities for evaluation by the courts[.]" U.S.S.G. ch. 7, pt. A § 3(a). Thus, a court must "merely consider (i.e., reflect on, think about, deliberate, ponder or study) policy statements because Congress had not required adherence to policy statements[.]" *United States v. Kenny*, 846 F.3d 373, 376 (D.C. Cir. 2017) (internal quotations omitted).

To calculate the applicable range, the court first determines the grade of violation. Violations range from Grade A to C. S*ee* U.S.S.G. § 7B1.1. The grade of supervised release violation depends on the "conduct constituting" the violation. *Id.* Grade B and C violations "constitute less serious offenses" than Grade A violations. *[Redacted] v. [Redacted]*, 2022 WL 4546737, at *1 (D.D.C. Aug. 29, 2022). Here, the Probation Office alleges a Grade B violation, which the Defendant does not contest. *See* Petition at 2; *also generally* Def.'s Memo. Given Mr. Akers' criminal history category, the applicable range of incarceration is 21–27 months. *See* U.S.S.G. § 7B1.4.

C. <u>Recommended Sentence</u>

Mr. Akers' reintegration since his release and subsequent misdemeanor plea has not been easy. But he has successfully done so: he works two jobs, maintains stable housing, and remains sober. These accomplishments are extraordinary. His sentence in the underlying case sufficiently punished him. And that sentence is ongoing. He will be supervised under the watchful eye of local probation officers for two years. Further detaining Mr. Akers would impose a sentence greater that necessary to fulfil public safety, deterrence, and rehabilitation goals. Such an outcome is contrary to law. *See* 18 U.S.C. § 3553(a). Thus, the undersigned recommends a sentence of time served (*i.e.*, the one day he was incarcerated) with no additional period of supervision.[2] *See e.g., Nwenze*, 2024 WL 4608867, at *9-10 (sentencing defendant to time served and no additional period of supervision); *United States v. Carpenter*, No. 16-cr-195-ABJ, 2024 WL 4531051, at *2 n.1 (D.D.C. Oct. 16, 2024), *report and recommendation adopted*, 2024 WL 4723211 (D.D.C. Nov. 8, 2024) (same); *cf. United States v. Wagner*, 573 F. App'x 598, 598–599 (7th Cir. 2014) (imposing time served based on Grade B violation).[3] This is the only sentence that comports with the Supreme Court's guidance that "[s]upervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000).

---

[2] "As both the government and Probation Office [have noted at a prior] final revocation hearing, there is little to gain from dual supervision." *United States v. Johnson*, No. 20-cr-105, 2025 WL 2538837, at *3 (D.D.C. Sept. 4, 2025).

[3] Just as was with the cases listed here, "no hearing is needed to adopt this Recommendation, as no additional supervision is ordered. Adoption of the Report and Recommendation would close this case." *Carpenter*, 2024 WL 4531051, at *2 n.1.

## III. CONCLUSION[4]

Reintegration is the goal, not a life on the severed floor revolving between prison and supervised release. *See United States v. Reddick*, 778 F. Supp. 3d 121, 133 (D.D.C. 2025).

Date: September 10, 2025

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

---

[4] The parties are hereby advised that, under the provisions of Local Criminal Rule 59.2(b) of the U.S. District Court for the District of Columbia, any party may file written objections for consideration by the district judge within fourteen days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).